RANDEE A. CARLSON, Indiv. and as Adm'r of the Estate of Alan R. Carlson, Deceased, Plaintiff-Appellee and Cross-Appellant, v. CITY CONSTRUCTION COMPANY, Defendant-Appellant and Cross-Appellee (Harry Blizzard and Associates, Third-Party Defendant-Appellee).

First District (5th Division)   Nos. 1—90—0511, 1—90—1078 cons.

Opinion filed November 13, 1992.

212

214

Haskell & Perrin, of Chicago (Kevin W. Doherty and Cynthia A. Brady, of counsel), for appellant.

Hayes & Power, of Chicago (Joseph A. Power, Jr., and David A. Novoselsky, of counsel), for appellee Randee A. Carlson.

Williams & Montgomery, Ltd., of Chicago (Barry Kroll, James K. Horstman, Anthony J. Kiselis, and Lloyd E. Williams, Jr., of counsel), for appellee Harry Blizzard & Associates.

JUSTICE GORDON delivered the opinion of the court:*

Plaintiff, Randee A. Carlson on her own behalf and that of her husband's estate and their three children, brought suit for damages resulting from the death of her husband Alan R. Carlson. Alan Carlson was killed on April 14, 1982, while working on a surveying crew on a road construction project on East River Road in Chicago when he was struck by an automobile driven by Richard Hample. Although Hample was originally named as a defendant in this action, he was dismissed upon plaintiff's motion prior to trial.

The primary contract for the construction project was between defendants City Construction Company and the County of Cook. At the time of his death, Carlson was employed by third-party defendant Harry Blizzard & Associates, which was a subcontractor on the project.

Plaintiff's complaint was in 11 counts. Count I was a survival action which alleged that City Construction had violated certain sections of the Injuries and Death During Construction Act (Ill. Rev. Stat. 1981, ch. 121, par. 314.1 *et seq.*), part of the Roads and Bridges Act (Ill. Rev. Stat. 1981, ch. 121, par. 1—101 *et seq.*), by failing to provide reasonably safe signs, signals, barricades or flagmen at the scene of the accident. Count II, a wrongful death action, alleged that City Construction was required by its contract with Cook County to provide traffic control devices for the project and that it failed to do so, in violation of the Injuries and Death During Construction Act. In count III, plaintiff sought recovery for expenses incurred as a result of the deceased's death, and was based upon alleged violations of the Injuries and Death During Construction Act. Count IV was a survival action, alleging negligence by City Construction in failing to provide adequate warnings at the construction site, while count V was a wrongful death action based upon the same allegedly negligent acts.

---

*An earlier opinion was filed in this cause on September 30, 1992, but has been withdrawn by order of this court on November 13, 1992. This opinion now stands in its place.

Count VI was similar to count III in that it sought recovery for expenses, but was brought under a negligence theory rather than one of statutory violations.

In counts VII, VIII, and IX, Cook County was named as the defendant. Count VII was a survival action, count VIII a wrongful death action, and count IX an action for expenses, all based upon the alleged negligence by the county in failing to require City Construction to provide traffic control devices in the construction area. Counts X and XI were directed against Hample, who, as noted above, was dismissed as a defendant prior to trial.

City Construction and Cook County filed counterclaims against each other for contribution, and both filed third-party claims against Harry Blizzard.

Prior to trial, numerous motions *in limine* were presented by all parties. These motions will be discussed where relevant in the body of this opinion.

Following a nine-day trial, the jury returned an itemized verdict in favor of the plaintiff and against City Construction, Cook County and Harry Blizzard & Associates, in the aggregate amount of $5 million. The jury apportioned damages as follows: City Construction, 74.9999998%; Cook County, 25.0000000%; and Harry Blizzard & Associates, .0000002%.

The jury also returned a verdict in favor of Cook County on its counterclaim against City Construction, and a verdict in favor of Cook County and against Blizzard on the county's third-party claim. The court entered judgment on the verdicts. No verdict was returned on City Construction's claim against Cook County or on City Construction's third-party claim against Blizzard.

The following evidence was presented at trial.

Ronald Bosco testified that he was familiar with the stretch of East River Road between Lawrence Avenue and Higgins Road, since he worked in the area and travelled that way twice a day. There was construction activity in the area. At the time of the incident he was travelling north on East River Road from Lawrence Avenue. Approximately 1½ or 2 blocks north of Lawrence, he was stopped by a flagman while some heavy equipment was being moved. The flagman carried a sign which said "slow" on one side and "stop" on the other. A small compact car was in front of Bosco's vehicle and was also stopped by the flagman.

When the flagman turned the sign to "slow," Bosco and the compact car both moved to the southbound lane to go around the equip-

ment in the road, and then moved back into the northbound lane. Bosco testified that their speed was 30 to 35 miles per hour.

Continuing his testimony, Bosco stated that as both cars proceeded north, the compact car swerved off to the right-hand shoulder of the road, started to "fishtail," and then struck the decedent in the road. The impact occurred in the southbound lane, close to the center line. At the scene of the accident, the road was open to both north and southbound traffic. Ten to fifteen seconds passed from the time the car first went off the right-hand shoulder until it struck the decedent. From the point where they were first stopped by the flagman until the decedent was hit was a distance of approximately three-quarters of a mile. Along that distance, Bosco saw no warning signs indicating construction ahead, survey crew or flagman ahead, nor were there any other flagmen present.

Bosco pulled off the road and went to see if he could assist. The decedent was still alive and had a faint but weak pulse.

Bosco further testified that the driver staggered when he exited his car, and his speech was slow and deliberate. Bosco testified that his first impression was that the driver was intoxicated, but conceded that his actions could have been due to shock.

Plaintiff called Peggy Podboy as the next witness. She testified that at approximately 1 p.m. on April 14, 1982, she was travelling southbound on East River Road south of Higgins Road and the Kennedy Expressway. She noticed two men in the middle of the road. She was surprised to see them there, since they were not wearing reflective gear, nor were there any warning signs or flagmen in the area. She also noticed a third man sitting in the roadway a short distance beyond the two men she had initially seen. In her estimation, he was 90% in the southbound lane.

Ms. Podboy testified that she slowed down to five miles per hour or less as she passed the man sitting in the road. Once past, she noticed a car coming towards her that was swerving and seemed to be out of control. She took her foot off the accelerator so as to avoid the car, and after it had passed she heard "a loud thump," looked in her rear view mirror and saw the car strike the man sitting in the road. After hearing this noise, she pulled over to the side of the road and stopped, and went over to where the man was lying in the roadway. She testified that she talked with the driver. His breath smelled of alcohol, and although his speech was clear, in her opinion, he was intoxicated.

Ms. Podboy further testified that, although there were construction signs and flagmen south of the accident scene closer to Lawrence

Avenue, there were none in the immediate vicinity of the accident. There were also signs to the north, between Devon and Higgins.

Plaintiff's next witness was Dr. John Edward Baerwald, a consulting traffic engineer. He testified about several manuals and publications in the field of traffic engineering. The Uniform Manual on Traffic Control Devices (hereinafter the Uniform Manual) is an official publication of the Federal Highway Administration of the United States Department of Transportation. This manual contains criteria regarding the use of traffic control devices, and also purports to represent a national standard to be followed by any governmental unit on roadways open to the public. It has been adopted by the Illinois Department of Transportation (hereinafter IDOT) pursuant to the mandate of the Illinois Vehicle Code that the Department "shall adopt a State manual and specifications for a uniform system of traffic-control devices consistent with this Chapter for use upon highways within this State." Ill. Rev. Stat. 1985, ch. 95½, par. 11—301.

Another publication of IDOT is the Standard Specifications for Road and Bridge Construction (hereinafter the Standard Specifications). This manual outlines the general requirements applicable to all highway improvements as well as provisions relating to methods, equipment and material for road and bridge construction projects.

Dr. Baerwald testified that pertinent to this particular case was section 107.14 of the Standard Specifications, which provides, in part:

"Wherever construction or maintenance work is done, the contractor shall protect the workmen and provide for safe and convenient public travel by providing, directing and maintaining to the satisfaction of the engineer and in accordance with the traffic control standards or designs included in the plans, all signs, signals, markings, traffic cones, barricades, warning lights, flagmen, and other traffic control devices required for the type of operation being performed.

\* \* \*

Barricades and/or cones used for channelization or delineation and warning signs shall be sequentially placed in the direction of the traffic flow and removed in reverse order. Lane closure signs and flagmen signs shall be erected prior to barricades and/or cones and remain erected until such time as all traffic control devices have been removed from the pavement.

\* \* \*

At all times during which men are working where two-way traffic is to be maintained over one lane of pavement or where traffic is restricted to less than the normal number of lanes on

a multi-lane pavement, the contractor will be required to furnish flagmen at his expense to protect his workmen and to warn and direct traffic. The flagmen shall be stationed to the satisfaction of the engineer and equipped with fluorescent orange vests and an approved flagman-type control sign.

Two flagmen will be required for each separate operation where two-way traffic is maintained over one lane of pavement and one flagman will be required for each separate operation where traffic is restricted to less than the normal number of lanes on a multi-lane pavement."

Dr. Baerwald explained that as used in the above standards, "contractor" referred to the general contractor on the project, City Construction, and "engineer" referred to the county's resident engineer.

Under section 105.06 of the Standard Specifications, the contractor is required to be on the job at all times when work is underway. Section 105.10 authorizes the resident engineer to require changes or stop the work if the general contractor is not complying with the contract or with the plans or specifications.

Standard 2303.5 governs stationary work activity within two feet of an edge of the road or in part of one lane, and requires cones or barrels blocking off the lane. It provides that "if the work operation does not exceed 60 minutes, traffic control may be in conformance with Standard 2307." This, Dr. Baerwald explained, meant that if workers were to be on the roadway for a relatively short time, it was not necessary to put out cones or barrels. Either standard could be used for short-term work.

Dr. Baerwald also testified regarding a preconstruction meeting held before actual construction work began, and attended by representatives of Cook County and City Construction, among others. Minutes of that meeting indicated that City Construction "was informed of his responsibilities with regard to the requirements of Section 107 of the Standard Specifications." Under the contract for the project, City Construction assumed responsibility for traffic control and was paid for providing traffic control and flagmen. The plans for the project, which City Construction signed off on, included the minimum requirements for traffic control protection, and referred to the Standard Specifications.

In Dr. Baerwald's opinion, the traffic control protection provided by City Construction was "grossly inadequate" at the time of the accident. It was the responsibility of City Construction to provide the protection, and the duty and responsibility of the county resident engineer to ensure that they did so.

Dr. Baerwald testified that the minimum requirements for traffic control protection for surveyors working in the road dictated that one lane should have been blocked to give the workers a protected work area. Dr. Baerwald stated that such protection is possible even though the surveyors were moving down the road, through the use of a flagman on either side of the surveyors and at least two advance warning signs in each direction advising that a flagman was ahead and that a lane was closed.

The witness was also questioned about the contract between City Construction and Cook County and the construction plans for the East River Road project. Under the contract, City Construction was responsible for traffic control and protection. The plans set out the minimum requirements for protection of workmen in the roadway, and incorporated standard 2307 by reference. This standard was applicable for short-term usage or for a moving operation such as the one in this case. If the workers were to be in the road for less than 15 minutes, at least two flagmen were required.

As Dr. Baerwald explained, a flagman has two duties. The first is to protect the workmen in the roadway, and the second is to protect the motoring public. If a motorist disregards that flagman's signal, the flagman should give immediate audible warning to the work crew.

In Dr. Baerwald's opinion, there also should have been advisory signs reducing the speed limit from 45 to 20 miles per hour.

Dr. Baerwald also testified, over City Construction's objection, regarding a 1979 Chicago traffic survey. According to that study, average daily traffic volume in the area of the accident was 12,900 vehicles per day. He stated that with this high volume of traffic, it was particularly important to have protection for workers in the roadway and to close a lane to afford them a safe area to work.

When the witness was asked whether, to a reasonable degree of certainty, in his opinion "City Construction Company failed to exercise ordinary care in the manner in which they protected the workmen particularly Alan Carlson on April 14, 1982," the court sustained an objection by City Construction. The court, however, overruled an objection to a question asking whether it was Dr. Baerwald's opinion that City Construction's "failure to comply with the minimal requirements *** in the plans and outlined by the law that more probably true than not to a reasonable degree of certainty resulted in Alan Carlson's injury and death." Dr. Baerwald answered "yes. If the minimum requirements had been satisfied, it's very likely that there would have been no injury at all much less a death."

On cross-examination by City Construction, Dr. Baerwald conceded that by its explicit language, Standard 107.14 applies only when a road is closed, and although the road should have been closed, in fact it was not.

Dr. Baerwald also testified that although the better practice is for the general contractor to provide all the signing, the subcontractor Blizzard should have provided vests and other protection for its men if the general contractor failed to do so.

Merlin Johnson, a resident engineer in charge of construction projects for defendant Cook County, was called to testify as an adverse witness by the plaintiff. He was in charge of the construction project on East River Road on which the decedent was killed.

Johnson testified about the preconstruction conference held in February 1982. At that meeting, City Construction was reminded of its obligation under the contract with the county to provide traffic control protection in conformity with section 107.14 of the Standard Specifications.

Johnson was also asked by plaintiff whether his son had obtained a job with City Construction, to which he responded that he had. Plaintiff refrained, however, from asking what his son's position with City Construction was. There was no contemporaneous objection made to the question or the answer, although prior to the start of Johnson's testimony, the court had denied a motion *in limine* on behalf of Cook County to exclude this evidence. The court ruled that the evidence would be admissible to show possible bias of Johnson towards City Construction.

On cross-examination, Cook County elicited from Johnson testimony that his son was actually employed as a flagman for City Construction. It was a summer job which lasted for only two or three days, in August 1982. Johnson testified that this employment had no relation to the accident. No objections were made to this testimony.

Plaintiff's next witness was Dr. Yuksel Konacki, a physician and assistant medical examiner for the Cook County medical examiner's office. Dr. Konacki performed a postmortem examination of Carlson and testified to the injuries he observed. Over objection by City Construction, he testified that it was "possible" that Carlson "might or could have been conscious for a period of time after the impact of the vehicle."

On cross-examination, Dr. Konacki admitted that the injuries which Carlson sustained were also consistent with a finding that he was rendered unconscious by the impact.

The next witness was the plaintiff, Randee Carlson. She and the decedent were married in 1976. They had three children. In 1979 her husband began working for Harry Blizzard on a survey crew. She testified that he wanted to become a civil engineer. Although he had dropped out of high school in his senior year, he had obtained his GED while in the army. She testified "the GED, the one he received in the army, got him really going and he really enjoyed—he couldn't figured [sic] out why he dropped out of school because he really enjoyed math especially. So when he hooked up with Mr. Blizzard and got the job, he was pretty certain of his—the way he wanted to go." His plans were to continue working and to attend night school at McHenry County College.

Randee Carlson identified an application form for an Illinois Veterans Scholarship which the decedent had completed and signed. On the form the date August 26, 1981, had been written and crossed out, replaced by January 4, 1982. The witness explained that his plans were to enter school in September of 1981, but due to the fact that he was busy with their new house, he delayed in submitting the application. When plaintiff sought to have the application admitted in evidence, City Construction objected.

During a sidebar, City Construction explained its objection that the application was speculative and without probative value. Plaintiff responded that the application came within the state-of-mind exception to the hearsay rule, and was admissible as evidence of a plan. Defendant's objection was overruled.

On cross-examination by City Construction, Randee Carlson testified that her husband never submitted the scholarship application. She also testified that she had remarried in January 1985.

Plaintiff's final witness was Dr. Walter D. Johnson, an economist at the University of Missouri at Rolla, which he testified is primarily an engineering-oriented institution. Dr. Johnson was asked about students who have a GED. He testified that they must meet the same entrance criteria as the individual with a traditional high school degree. Generally, GED students are older, having spent some time in the job market before returning to college. Quite often they are veterans, who are married and have families. Although there is an adjustment factor due to their having been out of school for a period of time, Dr. Johnson testified that GED students tend to have more drive, being older and often having given up a job to return to school and often having additional family responsibilities. In Dr. Johnson's experience, these people tend to work harder. There were no objections to any of this testimony.

Dr. Johnson further testified that at the time of his death, the decedent was earning $300 per week. According to Dr. Johnson, from the date of the decedent's death up until the trial, the loss of wages and fringe benefits amounted to $171,731. The post-trial loss, assuming a retirement age of 65 and a 6.4% annual salary increment, was $713,872. The total loss was $885,603.

When Dr. Johnson was asked "Now, you also reviewed an application, did you not, that Alan Carlson had picked up at McHenry College and had filled out in respect to a veteran scholarship?" City Construction objected. At the ensuing sidebar, City Construction urged that the witness was now going to testify as to the decedent's potential earnings with a college education and such testimony would be pure speculation. Counsel also pointed out that Dr. Johnson had been asked in his deposition whether he had an opinion as to whether the decedent would complete an engineering course, and Johnson had responded that he had no such opinion. As a result, City Construction argued that any opinion given at trial as to whether the decedent would have become an engineer would be in violation of Rule 220 (134 Ill. 2d R. 220), and any testimony as to the earnings of an engineer would therefore be speculation. The court overruled the objection to the pending question, but when testimony resumed, it sustained an objection to a question as to whether Dr. Johnson had an opinion whether the decedent might or could have become an engineer.

Dr. Johnson then testified to his calculations of the potential lost income had the decedent continued to work in the construction industry, gone to school part time for two years in order to receive GI or VA benefits, and then quit work and attended school full time for three years to achieve his engineering degree in 1989. Under these assumptions, the pretrial loss totalled $137,716, and the post-trial loss was $956,999, for a total of $1,094,715. City Construction renewed its previous objection, but was overruled.

On cross-examination, Dr. Johnson stated that his opinions regarding the characteristics of GED students were based upon 20 years' experience as a teacher. He also said that he would not say that Alan Carlson would have finished college. Regarding his calculations of lost earnings, Dr. Johnson said that he had not adjusted the figures for personal consumption of the decedent, which would range from 22% to 30%.

The parties then stipulated that Richard Hample, the driver of the car which struck the decedent, was driving under the influence of alcohol at the time and that his blood-alcohol level was shown by a breathalyzer test to be .21. The plaintiff then rested her case.

City Construction and Cook County both moved to strike those portions of Dr. Johnson's testimony having to do with the decedent's potential earnings if he had obtained a college degree because there was insufficient evidence as to whether Carlson would have been admitted to college or earned a degree. The court denied the motion to strike.

The court then granted City Construction's and Cook County's motions to strike those portions of the complaint which alleged violations of sections of the Roads and Bridges Act (Ill. Rev. Stat. 1981, ch. 121, par. 1—101 *et seq.*), finding that the act was inapplicable because the road was not closed. The court also granted defendants' motion to strike the survival counts, due to the lack of evidence that Carlson was conscious following the accident or that he suffered any pain. The court, however, denied defendants' motions for directed verdict on the remaining negligence counts.

Next, third-party defendant Blizzard presented a motion *in limine* to bar the questioning of its employees by the defendants as to the custom and practice on other construction sites with respect to whether or not flagmen would be provided for a project such as the one on which the decedent was killed. It argued that where the parties' obligations are governed by explicit law, such as the IDOT Standard Specifications testified to by Dr. Baerwald, custom and practice are irrelevant. City Construction opposed the motion, arguing that the standards to which Blizzard referred were not "law," and that the only law involved was the Roads and Bridges Act which the court had previously struck. City Construction also urged that custom and practice were relevant to the question of who had the control and obligation to provide the protection. The court granted the motion, ruling that it would not permit testimony which "contravenes" the law, either as it is set forth in the statutes or as set forth in standards promulgated by regulatory bodies.

Blizzard next brought up the matter of an "agreement of accommodation" between the plaintiff and third-party defendant Blizzard. That agreement stated, in part:

"Harry Blizzard & Associates agree[s] that in the presentation of its defense, as a contribution defendant, it will refrain from taking any position or asserting any contentions with respect to the nature and extent of the plaintiff's damages that is contrary to the interests of the plaintiff. Harry Blizzard & Associates agrees that it will confine its contribution efforts to establishing the culpability of the defendants and

the lack of culpability of itself with respect to the incident in question."

The court had reserved ruling on plaintiff's pretrial motion *in limine* to preclude any mention of the agreement, and now ruled that defendants could question Blizzard's employees about their knowledge of the agreement only to show possible bias.

City Construction then called as its first witness, Donald Pruter, an employee of Blizzard, who was examined as an adverse witness. Pruter had been a surveyor for 32 years, most of that time with Blizzard. He testified that at the time of the accident the decedent, along with two other surveyors including himself and James Czischki, another Blizzard employee, had been in the roadway for 15 to 30 minutes.

The witness was permitted to testify, over objection by Blizzard, that a combination of things, including the weather, the amount of traffic at the time, the amount of time the surveyors were to be in the roadway, and the straightness or curvature of the road, determines whether the warnings and signs provided were adequate for the job they were performing. In this case, the weather was clear, the road was straight, and the surveyors were to be moving every few minutes. The court sustained an objection by Blizzard to a question which sought to elicit whether he had been at jobs where flagmen were not used.

James Czischki, the other Blizzard surveyor, was also called as an adverse witness by defendant City Construction. He was the general foreman for Blizzard on the East River Road project in April of 1982. He testified that he agreed with Pruter that it was not necessary to use signs, vests or flags on the day of the accident. In response to a question about what went into the decision not to use those devices, he stated:

"Well, the signs we never use on a construction job. We use those for preliminary design surveys where there is no construction going on.

The vests, we didn't wear those. Everything was visible and we were working in a construction zone. It was one o'clock in the afternoon, it was clear, dry, no heavy traffic. The traffic that we did have going by was driving by slowly, sensibly, giving us plenty of room to work.

And as far as flag, we, there again, never use them on a construction site. We use them basically on preliminary design surveys where is [*sic*] there is no construction."

On cross-examination by Blizzard, Czischki clarified that they did not use the "survey ahead" sign in an area under actual construction nor did they use flags in such an area. When an area is under construction, it is left to the general contractor to provide whatever signs are required. Czischki was also asked whether a flagman was provided when he returned to work two days after the accident, to which he responded that he did not recall. No objection was offered to this question or answer.

City Construction rested its case.

Cook County, pursuant to a stipulation among the parties, introduced into evidence a single sheet which came from the plans for the project. This sheet contained the general notes for the project which had been referred to by Dr. Baerwald and Merlin Johnson. With no objection counsel read one of the notes to the jurors:

> "On Exhibit No. 4, No. 8, one through lane of traffic in each direction shall be maintained at all times along East River Road, except for periods of short duration between the hours of 9:00 a.m. and 3:00 p.m. when work shall be done in accordance with Standard 2303—5."

With this, the county rested.

Harry Blizzard was called as a witness in his own defense. He testified that as a subcontractor doing surveying work on the East River Road project, his company was under no contractual obligation to provide any traffic control services, nor were they requested to or paid for any such services.

When asked, "[A]s a normal practice, do you on other construction sites provide flagmen or develop a responsibility or take a responsibility for lane closures or signing and so on[?]" the court sustained an objection by City Construction and Cook County, stating that the court was not concerned with other jobs.

After the third-party defendant rested, plaintiff then presented a motion for a directed verdict on the issue of decedent's negligence, which the court granted. The court denied motions for directed verdicts by the defendants on the primary action and on their cross-claims and third-party actions. It also denied the motion by third-party defendant Blizzard for a directed verdict in its favor.

At the instruction conference, City Construction objected to several proposed instructions. Plaintiff's instructions 19, 20, 21, 22 and 35 were based upon Illinois Pattern Jury Instructions, Civil, No. 60.01 (2d ed. 1981) (hereinafter IPI Civil 2d). Plaintiff's instruction 19 instructed the jury:

"There was in force in the State of Illinois at the time of the occurrence in question the Standard Specifications for Road and Bridge Construction adopted by the Illinois Department of Transportation which provided that: \*\*\*."

The instruction went on to quote article 105.06 of the Standard Specifications, and concluded with:

"[I]f you decide that a party violated the standard on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether or not the parties were negligent before and at the time of the occurrence."

Plaintiff's 20 was identical to the above, except that it incorporated article 107.14 of the Standard Specifications. Plaintiff's 21 incorporated portions of the Uniform Manual, while 22 involved definitions from both the above manuals. Plaintiff's 35 set forth another section of the Standard Specifications.

City Construction argued that the standards involved are not statutes, and that IPI Civil 2d No. 60.01 as written states that "there was \*\*\* a certain statute," and was therefore erroneous. City Construction also argued that the standards involved did not have the force of law. The court disagreed that the regulations did not have the force of law, and decided to give the instructions with the modification that the first paragraph be changed to indicate that it was an agency standard or regulation involved rather than a statute.

The jury was also given Plaintiff's instruction No. 27, based upon IPI Civil 2d No. 31.04 and dealing with pecuniary loss to the widow and daughters of the deceased. The instruction stated that "Randee Carlson was not entitled to damages for loss of Alan Carlson's society and sexual relations after January 7, 1984."

Following closing arguments, the jury retired to deliberate. After the court was advised that the jury had reached a verdict but prior to its publication, counsel for third-party defendant Harry Blizzard & Associates informed the court that while the jury was deliberating, his client had reached a settlement with the plaintiff in which Blizzard waived its worker's compensation lien in return for a cap on its liability. Blizzard therefore presented a motion asking the court to find that its settlement with the plaintiff was a good-faith settlement within the meaning of section 2 of the Contribution Among Joint Tortfeasors Act (Ill. Rev. Stat. 1987, ch. 70, par. 302), and to dismiss Harry Blizzard & Associates from the law-

suit. Both defendants objected, and the court deferred ruling on the motion.

The jury's verdicts found in favor of the plaintiff and against both defendants. It assessed damages as follows:

| | |
|---|---|
| Loss of services suffered by Randee Carlson: | $500,000; |
| Loss of services suffered by Katherine Carlson: | $500,000; |
| Loss of services suffered by Sarah Carlson: | $500,000; |
| Loss of services suffered by Abbigail Carlson: | $500,000; |
| Loss of society suffered by Randee Carlson: | $500,000; |
| Loss of society suffered by Katherine Carlson: | $500,000; |
| Loss of society suffered by Sarah Carlson: | $500,000; |
| Loss of society suffered by Abbigail Carlson: | $500,000; |
| Loss of money and goods to the estate of Alan Carlson: | $1,000,000. |

On the claim of Cook County against City Construction, the jury found in favor of Cook County and against City Construction. On the claim of Cook County against Harry Blizzard & Associates, the jury found in favor of Cook County and against Harry Blizzard & Associates. The jury apportioned damages as follows: City Construction, 74.9999998%; Cook County, 25.0000000%; and Harry Blizzard & Associates, .0000002%.

The court asked the foreman if that completed the verdict forms, to which he replied it did. City Construction then asked whether there was any finding on the counterclaim of City Construction. The court replied, "The verdict forms utilized by the jury are as announced by the jury foreman." There was no request by any party that the jury be asked to complete the other verdict forms.

At a post-trial hearing, counsel for City Construction indicated that his client was insured by Bituminous Insurance Company to the extent of $500,000, with excess insurance from another carrier. Counsel indicated that he had been directed by the primary insurer to tender its $500,000 policy to the court, plus interest accrued since the verdict. He also stated that the excess insurer had indicated that it was desirous of taking an appeal of the verdict against City Construction.

Cook County subsequently settled with the plaintiff. The trial court, without objection, granted the county's petition for a good-faith finding, pursuant to section 2(c) of the Contribution Among Joint Tortfeasors Act (Ill. Rev. Stat. 1987, ch. 70, par. 302), and ordered that "all actions of all parties, including that of City Construction Company against Defendant County of Cook, a Body Politic, are dismissed with prejudice." The court also found that the settlement be-

tween the plaintiff and Blizzard was in good faith, and vacated the judgment in favor of Cook County against Blizzard.

City Construction was therefore left as the only defendant in this cause, and the court denied its post-trial motions.

City Construction brings this appeal from the judgments entered on the verdicts and from the order finding the settlement between Blizzard and the plaintiff to be in good faith and vacating the judgment against Blizzard.

At oral arguments before this court, we granted City Construction's motion to dismiss the appeal against Blizzard. As to the remainder of City Construction's appeal, for the reasons set forth herein, we affirm with modification.

OPINION

City Construction raises numerous issues on appeal. The first area of contention concerns the evidence of pecuniary loss to the decedent's estate. City Construction argues that the financial aid application completed by the decedent but never submitted to any college was erroneously admitted since it was speculative and not relevant or probative to establish that the decedent would have applied to a college or become a civil engineer. The significance of the admission of this application was that it then provided a basis for the admission of testimony by plaintiff's economist regarding the earnings decedent would have received had he become an engineer, testimony which City Construction contends was speculative and therefore inadmissible.

Testimony as to loss of earnings which is remote or merely speculative is improper. (*Christou v. Arlington Park-Washington Park Race Tracks Corp.* (1982), 104 Ill. App. 3d 257, 260, 432 N.E.2d 920.) Recovery may only be had for loss which is reasonably certain to occur. (*Long v. Friesland* (1988), 178 Ill. App. 3d 42, 56, 532 N.E.2d 914; *Christou,* 104 Ill. App. 3d 257, 432 N.E.2d 920.) It is error to permit testimony regarding future earnings when those earnings are based upon a mere ambition for advancement. (*Christou,* 104 Ill. App. 3d 257, 432 N.E.2d 920.) Beyond ambition, it must be established that the decedent had the ability and the opportunity to realize that ambition. (*Lorenz v. Air Illinois, Inc.* (1988), 168 Ill. App. 3d 1060, 1064, 522 N.E.2d 1352 (testimony that had decedent lived he would have become dean of university held proper due to fact that decedent "had already achieved the highest professorial rank, had held a very strong administrative post *** , and was quite young").) Once it has been established with reasonable certainty that decedent would have experienced job advancement, then the speculative nature of testimony re-

garding the commensurate increases in pay is decreased to a point that its admission is not error. (*Exchange National Bank v. Air Illinois, Inc.* (1988), 167 Ill. App. 3d 1081, 1086-87, 522 N.E.2d 146.) Without such evidence, testimony regarding future earnings based solely upon the decedent's ambition is speculation and inadmissible. *Christou,* 104 Ill. App. 3d 257, 432 N.E.2d 920.

In *Christou,* the plaintiff was unemployed at the time of the accident, but had previously worked as a busboy and was in training for a job as a bartender. Plaintiff testified that as a bartender his salary would have been $200 to $250 per week. He also testified that, prior to his accident, his ambition was to own a restaurant. A restaurant owner was allowed to testify that the average profitability of an average restaurant was $500 to $700 per week. The court held this testimony to be too remote and speculative since owning a restaurant was "merely an ambition of plaintiff's which had never materialized." *Christou,* 104 Ill. App. 3d at 260.

■ Here, there was evidence that the decedent had an ambition to become an engineer. There was also testimony that he liked math and that he had completed his GED while in the army. Beyond that, however, there was little evidence to establish with any degree of reasonable certainty that he could or would have become an engineer. He had not attended any college, nor had he applied to or been accepted by a college. (*Cf. Valiulis v. Scheffels* (1989), 191 Ill. App. 3d 775, 789, 547 N.E.2d 1289 (no error in allowing testimony of future earnings of college graduate where plaintiff had completed equivalent of 2½ years of college).) While the evidence disclosed that he had filled out an application for financial assistance to attend college, he never submitted it to any school. Although he completed the application in August 1981, he did not submit it at that time. His wife attributed the delay to his "being busy with a new house." He did not, however, submit it for the following term either, which would have commenced in January 1982. Thus, as of the date of the accident in April of 1982 he had not submitted any application to any college. (*Cf. Pinkstaff v. Pennsylvania R.R. Co.* (1959), 23 Ill. App. 2d 507, 507-22, 163 N.E.2d 728 (wage scale of job which had been open to plaintiff for more than a year but which he had not taken, held to be speculative and therefore inadmissible).) It may also be noted that when Dr. Johnson was asked whether he had an opinion as to whether the decedent would or could have become an engineer, he said that he could not say that the decedent would have finished college.

These shortcomings in the evidence here distinguish this case from the following cases, cited by the plaintiff. In *Lorenz,* the dece-

dent had already attained a high-level administrative position at the university, and witnesses testified to his potential for advancement to the position of dean. Similarly, in *Exchange National Bank*, the decedent had been promoted through the ranks to the position of business agent of her union, and there was testimony from the secretary-treasurer and the president of the union that had the decedent lived, she would have ultimately become president of her local. In *Valiulis*, there was testimony that the plaintiff had completed 2½ years of college, and it was reasonable to conclude that but for his injury he would have graduated. In each of those cases, there was an indication that the plaintiff or decedent had the ability to attain his goal, and was, at the time of the injury or death, on a course leading to advancement. There was concrete evidence from which the jury could extrapolate, with some degree of certainty, that with the passage of time, the decedent would have achieved his ambition.

Based on our review of the record in the instant case, we conclude that there are simply too many speculative contingencies present to establish with any degree of certainty that the decedent would have become an engineer. The facts in this case place it somewhere between *Christou* and *Valiulis*. In *Christou*, there is no indication that the plaintiff ever took any steps toward fulfillment of his ambition to own a restaurant as an entrepreneur (although there was evidence that he had served in various subordinate positions as a restaurant employee). Here, on the other hand, the decedent did take some preliminary steps in obtaining his GED and in filling out a form for financial aid as a college student more than a year prior to his death. Unlike the facts in *Valiulis*, the decedent never attended or even applied to a college and left no track record as a college student. Moreover, although he did fill out an application for financial aid, it remained unused and unfiled for more than a year prior to his death. Therefore, there is insufficient evidence to support with any certainty that the decedent would have become an engineer, in view of the many untested and unproven contingencies which would have to be fulfilled in order to achieve that career. As a result, we find that the evidence regarding the decedent's lost earnings as an engineer was impermissible speculation and should not have been allowed.

Here, the estimated lifetime loss of wages and fringe benefits of the decedent at his current job was $885,603. The estimated loss had he attained an engineering degree was $1,094,715. As itemized, the award to the estate of the decedent for loss of money and goods was $1 million. The closeness of the actual award to the expert's estimates

makes it evident that the award was based upon the speculation that his earnings would have been those of an engineer.

Our determination that the award to the estate was excessive does not, however, require remandment for retrial of this matter. When an appellate court is convinced that an award is excessive, it may order a remittitur. (*C. Hutchinson & Co. v. E.W. Lancaster, Inc.* (1983), 119 Ill. App. 3d 610, 614, 456 N.E.2d 983; *Rivenbark v. Finis P. Ernest, Inc.* (1976), 37 Ill. App. 3d 536, 541, 346 N.E.2d 494.) Pursuant to our powers under Supreme Court Rule 366(a) (134 Ill. 2d R. 366(a)), we may modify the award to reflect a proper award of damages when the damages awarded are excessive or are unsupported by the facts of the record. *Nemeth v. Banhalmi* (1984), 125 Ill. App. 3d 938, 972, 466 N.E.2d 977.

In our original opinion, we proceeded to order a remittitur to reduce this item of the award to $885,603. Defendants, however, have petitioned for rehearing in which they have urged that this item be further "remitted by a figure of 22 to 30% to conform to the evidence" of decedent's personal consumption. We agree. (See *Allendorf v. Elgin, Joliet & Eastern Ry. Co.* (1956), 8 Ill. 2d 164, 133 N.E.2d 288 (award to estate properly reduced by amount which decedent took for personal expenses).) Plaintiff did not dispute that a deduction for personal consumption was proper, and in closing argument at trial told the jury that it should deduct personal expenses when it assessed damages to the estate.

Plaintiff's own economist estimated decedent's personal consumption to range from 22% to 30% of the decedent's wages. Although there was some attempt on the part of the plaintiff to challenge these percentages on redirect examination of her economist, no alternative figures were offered by the plaintiff or, for that matter, by any of the defendants. See *Allendorf v. Elgin, Joliet & Eastern Ry. Co.*, 8 Ill. 2d 164, 133 N.E.2d 288.

We therefore revise our original opinion as follows to reflect this additional deduction for personal consumption in the computation of the remittitur. First, the award must be reduced from $1 million to $885,603, due to the erroneous admission of evidence regarding the decedent's lost earnings as an engineer. From that amount, a further reduction is required to account for the decedent's personal consumption. Of the $885,603 lost wages and fringe benefits of the decedent at his current job, $692,498 was due to lost wages while $193,105 was attributable to fringe benefits. Twenty-two percent of the wage portion, $692,498, is $152,350. Reducing the loss of $885,603 by this

amount, we arrive at a proper award of $733,253, and so modify the judgment of the trial court.

■ In a related argument, City Construction also complains of testimony by Dr. Johnson regarding the characteristics of a person who has received a GED, arguing that this testimony went beyond the scope of Johnson's opinions listed in response to Rule 220. Although the record reveals that there were objections to other portions of Johnson's testimony, including an objection which was sustained to a question regarding whether Johnson had an opinion about whether the decedent could have become an engineer, there was no objection to this testimony. Accordingly, City Construction has waived this issue. *Forest Preserve District v. Lehmann Estate, Inc.* (1944), 388 Ill. 416, 430, 58 N.E.2d 538.

Moreover, even had this issue not been waived, any error in the admission of this testimony does not require reversal. To the extent that the testimony regarding the characteristics of a student who had received a GED was offered to show that the decedent would have attended college, it was error, in that it would have permitted the jury to speculate that the decedent would have attended college and become an engineer. However, since we have determined that the error in the damage award resulting from such speculation may be corrected by a reduction in damages, any error here is harmless.

City Construction's next alleged error concerns the testimony of Dr. Konacki, the pathologist who performed the autopsy on the decedent, regarding whether the decedent was conscious of pain before he died. The argument is that the doctor was allowed to render an expert opinion but was not disclosed as an expert prior to trial as required by Supreme Court Rule 220, and therefore his testimony and opinion were inadmissible.

■ Here, too, we need not address the merits of this argument since the record indicates that at the close of the plaintiff's case in chief, the trial court directed a verdict in favor of the defendants and against the plaintiff on the survival counts. As a result, this testimony could have no impact on the jury's verdict and result in no prejudice to City Construction.

The next error alleged by City Construction is that the trial court erred in allowing certain IDOT standards and specifications to be construed as law. It argues that it was error to allow the use of IPI Civil 2d No. 60.01 to submit these standards to the jury in plaintiff's instructions Nos. 19, 20, 21, 22 and 35.

At issue here are certain sections of IDOT's Standard Specifications for Road and Bridge Construction and its Uniform Manual for

Traffic Control Devices for Streets and Highways. These standards were introduced into evidence through the testimony of plaintiff's traffic safety expert Dr. Baerwald. There is no question that they were admissible into evidence. (*Ruffiner v. Material Service Corp.* (1987), 116 Ill. 2d 53, 58, 506 N.E.2d 581 ("[e]vidence of standards promulgated by industry, trade, or regulatory groups or agencies may be admissible to aid the trier of fact in determining the standard of care in a negligence action *** even though the standards have not been imposed by statute or promulgated by a regulatory body and therefore do not have the force of law").) In fact, City Construction admits that they were relevant. The question is whether it was error to submit them to the jury in the form of an instruction.

In *Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 356 N.E.2d 93, the court set forth the requirements for submission of administrative rules, regulations or orders under IPI Civil 2d No. 60.01. The rules or regulations must be "designed to protect human life or property," they must be validly adopted and "have the force of law." (64 Ill. 2d at 390.) The parties disagree as to whether the standards here have the force of law.

Plaintiff contends that they do have such force, citing section 5 of the Injuries and Death During Construction Act of the Roads and Bridges Act, which provides that "[a]ny contractor, subcontractor, or his authorized agent in charge of construction work on highways or bridges within the State of Illinois, or any driver of any motor vehicle, who knowingly or wilfully violates any provision of this Act, is guilty of a petty offense." (Ill. Rev. Stat. 1989, ch. 121, par. 314.5.) Plaintiff also urges that because the contract between City Construction and the county called for compliance with these regulations and the county's resident engineer had the authority to demand compliance with the regulations, these regulations and standards possess the requisite force of law.

Defendant responds that the standards cannot have the force of law in this case by virtue of any provision of the Roads and Bridges Act, since at the close of plaintiff's case, the defendants were granted directed verdicts on those portions of the complaint alleging violations of that act, thus making the act inapplicable. Further, defendant urges that these standards lack the force of law because IDOT does not have the power to require county highways to conform to any particular standard, citing *American State Bank v. County of Woodford* (1977), 55 Ill. App. 3d 123, 371 N.E.2d 232, for support.

■ Initially, we note that the instructions at issue here contained portions of two different manuals. While the parties make no distinc-

tion in their arguments between the two, there are differences which need to be addressed. The Uniform Manual, a section of which was incorporated into Plaintiff's Nos. 21 and 22, purports on its face to have been enacted by IDOT pursuant to authority granted in the Illinois Motor Vehicle Code. (Ill. Rev. Stat. 1985, ch. 95½, par. 11–301.) Although City Construction urges that the manual, which is incorporated by reference into sections 2 and 4 of the Injuries and Death During Construction Act (Ill. Rev. Stat. 1985, ch. 121, pars. 314.2, 314.4), is inapplicable here due to the trial court's dismissal of the charges based on that act, that fact does not negate any force the Uniform Manual has under the Illinois Vehicle Code. In *Wade v. City of Chicago Heights* (1991), 216 Ill. App. 3d 418, 438, 575 N.E.2d 1288, the court stated, without extended discussion, that rules from this manual "adopted by an administrative agency pursuant to a grant of statutory authority have the force of law."

■ The authority for the enactment of the other manual involved, the Standard Specifications, is less clear. On its face there is no indication under what statutory authority it was enacted, although section 4–201.1 of the Roads and Bridges Act grants to IDOT the power "[t]o determine and adopt rules, regulations and specifications for State highways not inconsistent with this Code." (Ill. Rev. Stat. 1985, ch. 121, par. 4–201.1.) It was this manual which the court in *American State Bank v. County of Woodford* found to be without "the force of law." (*American State Bank v. County of Woodford*, 55 Ill. App. 3d at 132.) This finding was based on the court's observation that "[t]he Illinois Highway Code (Ill. Rev. Stat. 1973, ch. 121, pars. 1–101 to 11–107) does not give the Department of Transportation, whose standard was the subject of the instruction, power to require county highways to conform to any particular standard." *American State Bank v. County of Woodford*, 55 Ill. App. 3d at 131-32.

However, even if the Standard Specifications lack the force of law due to the lack of power of the Department of Transportation to require county highways to conform to those standards, that does not necessarily rule out the possibility that they have such force by virtue of the fact that they are part of the contract between City Construction and Cook County. This is the position which plaintiff argues here.

Where State standards are incorporated into a contract between a contractor and the State, a contractor has the duty to comply with State standards. The duty is imposed by the incorporation of the standards in the contract. (*Kreke v. Caldwell Engineering Co.* (1982), 105 Ill. App. 3d 213, 225, 433 N.E.2d 1337.) In *Ryan v. Mobil Oil Corp.* (1987), 157 Ill. App. 3d 1069, 1083, 510 N.E.2d 1162, the court

found no error in the submission of an instruction that asserted the defendant Mobil could be negligent if it violated an OSHA regulation. The court rejected Mobil's argument that it did not owe the plaintiff a duty to enforce the regulation for his benefit. It found that Mobil had a duty to enforce this regulation by virtue of its contract with the plaintiff's employer, and, as a result, the jury was correctly instructed that Mobil could be held liable for failure to require conformance with the OSHA regulation.

In *Grimming v. Alton & Southern Ry. Co.* (1990), 204 Ill. App. 3d 961, 992, 562 N.E.2d 1086, the court found no error in admitting evidence of and submitting an instruction on an American Association of Railroads interchange rule. Clearly, the rules of the American Association of Railroads are not enforceable by virtue of any statute. Rather, their force derives from the parties' agreement to be bound by such rules. Nevertheless, the court concluded that it was not error to instruct the jury on the rule. The court noted that the defendant had agreed to be bound by the rules which imposed obligations on the owners of railroad cars, and the instructions based on the rule aided the jury in determining the standard of care owed by the defendant.

Here, by virtue of the inclusion of these standards into its contract, City Construction can be held to have assumed a duty to comply with the State standards for traffic control at the construction site. There was evidence in the record that City Construction had agreed to be bound by and to conform to the State standards. Dr. Baerwald testified that they were part of the contract between the defendant and the county, and were incorporated into the plans for the project. There was also testimony that at the preconstruction meeting, the county emphasized to City Construction its responsibility under the contract to conform to these standards. The county's resident engineer, Merlin Johnson, testified that he had the authority to suspend work if the standards were not being met. Thus, the standards at issue here were not without force, since defendant's compliance could be enforced by the county, even if no statute had specifically provided for such enforcement. As a result, we conclude that there was no error in instructing the jury regarding these standards.

We also note that the jury was instructed that if it should determine that a party had violated the standard, that was but one fact to be considered together with all other facts in evidence. Even in *American State Bank v. County of Woodford* (55 Ill. App. 3d at 132), where the court found the Standard Specifications to be without the force of law, it nevertheless concluded that giving of the instruction was not reversible error since "the instruction properly stated the consider-

238

ation to be given by the jury to the evidence," thus causing defendant no substantial prejudice.

■ Although City Construction also alleges error in plaintiff's repeated references in opening and closing arguments to these specifications as "law," no objection was made at the time. As a result, even had we concluded that these specifications were without the force of law, this issue is waived. (*Pharr v. Chicago Transit Authority* (1991), 220 Ill. App. 3d 509, 581 N.E.2d 162.) Moreover, viewed from the perspective of the entire trial, which lasted for almost two weeks, we cannot conclude that even a clear misuse of these terms would be sufficiently prejudicial to require reversal.

■ Also waived is the contention that the court erroneously prevented Blizzard employees Donald Pruter and James Czischki from testifying regarding custom and practice on the use of flagmen, testimony which the court refused to admit to contradict the standards discussed above. City Construction has failed to preserve this issue for appeal by its failure to make an offer of proof so as to inform the court what evidence was erroneously excluded. *In re Marriage of Eckert* (1988), 119 Ill. 2d 316, 518 N.E.2d 1041.

Although a formal offer of proof, by means of questions put to the witness outside the presence of the jury, is not required to preserve an issue of erroneously excluded evidence, there must be some indication of what the witness would have testified to in order for the reviewing court to assess any prejudice arising from the exclusion. (*Hall v. Northwestern University Medical Clinics* (1987), 152 Ill. App. 3d 716, 722, 504 N.E.2d 781.) Aside from the fact that City Construction was the party asking the questions, there is insufficient indication what these witnesses would testify to, nor is there anything in the record from which such a determination can be made. In fact, we note that Czischki was permitted to testify that they did not use signs or flags on construction jobs, nor did they wear vests on clear dry days when traffic was not heavy. Without any showing as to what was excluded, we have no choice but to consider the issue waived.

Even had the issue not been waived, we would find no error in excluding any testimony regarding custom and practice which was at variance with the standards discussed above, since such evidence is immaterial when the standards have the force of law (*Clements v. Schless Construction Co.* (1967), 91 Ill. App. 2d 19, 26, 234 N.E.2d 578; see also *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.* (1970), 121 Ill. App. 2d 445, 464, 257 N.E.2d 216), and arguably need not be admitted where it would vary the standards included

in an unambiguous written contract. See *Kuhn v. General Parking Corp.* (1981), 98 Ill. App. 3d 570, 424 N.E.2d 941.

The defendant next contends that plaintiff's expert, Dr. John Baerwald, was erroneously allowed to testify that if City Construction had complied with the requirements specified in the plans and standards, it was likely that there would have been no injury or death. City Construction, however, has waived this issue.

Our review of the record discloses that throughout the trial, the parties frequently requested and the court granted requests for sidebar discussions on objections. In those discussions, the grounds for objections were clarified and ruled upon. No such request was made here so as to define the basis of this objection. Accordingly, the general objection made by City Construction did not suffice to preserve this issue for review, and we consider it waived.

Moreover, expert testimony is permissible to assist the jury when the testimony concerns subject matter outside the common knowledge of the average juror. (*Suich v. H & B Printing Machinery, Inc.* (1989), 185 Ill. App. 3d 863, 541 N.E.2d 1206.) The test for admitting expert opinion is whether it will aid the jury in understanding the facts. (*Johnson v. Commonwealth Edison Co.* (1985), 133 Ill. App. 3d 472, 484, 478 N.E.2d 1057.) The fact that an expert witness, in stating his opinion, will testify to an ultimate issue does not render his testimony inadmissible. (*Johnson,* 133 Ill. App. 3d 472, 478 N.E.2d 1057; *Spence v. Commonwealth Edison Co.* (1975), 34 Ill. App. 3d 1059, 1070, 340 N.E.2d 550.) We cannot say that a traffic engineer's opinion regarding the effect of compliance or noncompliance with regulations and standards on the safety of construction workers would not be of assistance to the jury in reaching its verdict. Admission of expert testimony is within the discretion of the trial judge (*Brendel v. Hustava* (1981), 97 Ill. App. 3d 792, 423 N.E.2d 503), and we find no abuse of that discretion in this case.

City Construction raises an additional issue regarding Dr. Baerwald's testimony. It argues that it was error to permit him to testify regarding a 1979 traffic study, since it was irrelevant and introduced without a foundation. Prior to Baerwald's testimony, City Construction sought to have the study excluded based on a lack of relevancy and the fact that it gave misleading information since it was based upon conditions which existed in 1979 and the accident in question occurred in 1982. In opposition, plaintiff argued that this was the last study done prior to the accident, and was what would have been used to prepare recommendations for signage on the construction project. The court denied City Construction's motion, stating that the

parties would have the right to cross-examine the witness regarding the study and its applicability to the conditions at the time of the accident.

■ On direct examination, an expert may reveal the materials upon which he reasonably relies in forming his opinion. (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322.) Once Dr. Baerwald testified regarding the study, it was up to the defendants, through cross-examination of the witness, to attack the reliability of his opinion and the basis for it. Although it would have been preferable to establish the expert's reliance more explicitly on direct examination, we cannot find prejudicial error in this regard since the defendant was free to fully cross-examine the expert on that question. The trial court specifically stated that the parties would have the opportunity to cross-examine Dr. Baerwald about the study, yet the record reveals that no questions were asked of him on this subject. Nor, for that matter, was there any objection made as to the technical insufficiency of the foundation.

The next issue raised by City Construction is the references made in closing arguments by attorneys for the plaintiff, Cook County and Blizzard to the fact that City Construction did not produce any witnesses, references which City Construction contends were in violation of plaintiff's motion *in limine* granted prior to trial which barred any references to the fact that City Construction was bankrupt.

■ Plaintiff urges, however, that the motion *in limine* extended only to its explicit language, and that City Construction's failure to specify the scope of the motion prevents it from complaining that the motion was violated. A motion *in limine* order must be clear, and the parties must have an accurate understanding of its scope. (*Reidelberger v. Highland Body Shop, Inc.* (1981), 83 Ill. 2d 545, 416 N.E.2d 268.) Here, the motion *in limine* barred only evidence that City Construction was bankrupt, and made no mention of and hence did not bar any reference to "missing City witnesses." Thus, it would seem that the references of which City Construction now complains were not within its scope. In fact, the record indicates that all parties seemed to have been of the impression that such references were not covered by the motion, since attorneys for all of the parties, other than City Construction, commented in closing arguments that City Construction had produced no witnesses. Significantly, City Construction offered no objection, a fact which by itself would constitute a waiver of this issue. Thus, whether we deem these comments to have been beyond the scope of the motion *in limine*, or the issue to have

been waived by lack of a contemporaneous objection, we must reject this claim of error.

■■■ City Construction also urges that it was error to permit questioning of Merlin Johnson regarding the employment of his son as a flagman by City Construction. We consider this issue to have been waived due to the failure to offer an objection at the time the testimony was offered. Although a motion *in limine* was presented prior to Johnson's testimony, this does not obviate the need for a contemporaneous objection. (*Romanek-Golub & Co. v. Anvan Hotel Corp.* (1988), 168 Ill. App. 3d 1031, 522 N.E.2d 1341.) While it is not always necessary to repeat an objection each time similar evidence is presented once the court has ruled, it is nonetheless necessary to object the first time. *Nave v. Rainbo Tire Service, Inc.* (1984), 123 Ill. App. 3d 585, 588-89, 462 N.E.2d 620.

Here, the trial court denied City Construction's motion to exclude the evidence on the basis that it was irrelevant, and ruled that the evidence would be admissible to establish possible bias on the part of Johnson. When plaintiff's counsel elicited testimony that Johnson's son had been employed, no objection was made. Later, when the additional fact that the son was employed as a flagman was established, no objection was offered. While we do not believe that admission of this testimony constituted substantive error, we need not discuss the merits due to the waiver. *Casson v. Nash* (1978), 74 Ill. 2d 164, 384 N.E.2d 365.

In addition, the further argument, that by allowing evidence that Johnson's son was employed as a flagman the court erroneously permitted evidence of post-occurrence remedial changes, is also waived since it was not raised below. (*Casson v. Nash,* 74 Ill. 2d 164, 384 N.E.2d 365.) Moreover, the record shows that Johnson's son worked for City Construction in August 1982, four months after the accident at issue. Also, there was no testimony as to whether he worked on the East River Road project or on some other project of City Construction. Thus, the characterization of this employment as a "post-occurrence remedial change" is tenuous at best, and any prejudice from its admission would be insignificant.

City Construction next contends that the trial court improperly excluded evidence of Richard Hample's guilty plea to reckless homicide. The argument here is that the plea was an admission by Hample that his reckless driving caused the decedent's death, that it was admissible as a declaration against interest, and that it was relevant to City Construction's theory of the case that Hample was the sole, proximate cause of the accident.

██ We agree that the plea would have been admissible as a declaration against interest. At the time he entered the plea, it exposed him to civil damages arising from the accident, and thus he may well have been aware that it was in derogation of his pecuniary interests. (*Buckley v. Cronkhite* (1979), 74 Ill. App. 3d 487, 393 N.E.2d 60.) We also agree that it had some probative value which, although far from conclusive, leaned in the direction of City Construction's theory that Hample was the sole proximate cause of the accident, since to the extent it points to his greater participation in the accident, it tends to diminish the significance of other causes.

However, notwithstanding the fact that the guilty plea was admissible, we do not find its exclusion to be reversible error. There was sufficient other evidence to establish that Hample was intoxicated and was driving recklessly. The parties stipulated that Hample was intoxicated and that his blood-alcohol level was .21 at the time of the accident. Two uncontradicted eyewitnesses graphically described the occurrence, including Hample's erratic driving and bizarre conduct at that time. Therefore, the introduction of the guilty plea itself would not have added anything substantial to that which was already in evidence. Accordingly, we find no reversible error in its exclusion.

City Construction's next contention involves jury instructions on damages. The argument is that the court erroneously instructed the jury that Randee Carlson's claim for loss of society and sexual relations terminated on the date of her remarriage, but did not provide that the loss of material services also terminated on that date.

██ At the instruction conference City Construction made no objection to the instruction of which it now complains, a failure which constitutes a waiver of the issue. (*Deal v. Byford* (1989), 127 Ill. 2d 192, 537 N.E.2d 267.) In addition, no alternative instruction was tendered and rejected. As stated in *Auton v. Logan Landfill, Inc.* (1984), 105 Ill. 2d 537, 549, 475 N.E.2d 817, a party

> "cannot take the position on appeal that a case should have been presented to the jury with different instructions than those which were given unless at trial he tendered instructions which set forth the statement of the law he contends, on appeal, would have been the proper one."

In an attempt to avoid the impact of its failure to object or to offer an instruction of its own, City Construction cites *Bullard v. Barnes* (1983), 112 Ill. App. 3d 384, 445 N.E.2d 485, *aff'd & remanded* (1984), 102 Ill. 2d 505, 468 N.E.2d 1228, in which the appellate court considered the question of excessive damages due to an erroneous instruction in spite of the appellants' apparent waiver of the

issue by failure to argue the matter before the appellate court or to raise the issue in their brief. The court there based its determination to address the issue upon Supreme Court Rule 341(e)(7), which deals with waiver resulting from failure to argue an issue in the appellate court (134 Ill. 2d R. 341(e)(7) ("points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing")), a rule which, the appellate court noted, is not a limitation on its own jurisdiction. That rule, however, is not what is invoked here since the waiver in this case resulted from the defendant's failure to object in the trial court, not from any failure to raise or argue the point in this court. We cannot accept City Construction's argument that an allegation of excessive damages made in the appellate court is sufficient to cure a waiver by its own silence and its failure to tender an alternative instruction in the trial court, for to do so would defeat the purpose of requiring the objection below in order to provide the parties and the court the opportunity to remedy the error. See generally M. Graham, Cleary & Graham's Handbook of Illinois Evidence §611.27 (4th ed. 1984).

City Construction next urges that it is entitled to a new trial because the trial court erroneously directed a verdict in favor of the plaintiff on the issue of contributory fault. In doing so, the trial court stated that the decedent's contributory fault was not adequately raised by City Construction's answer or sufficiently supported by the evidence.

■■■ Upon review, we conclude that the trial court did not err in directing a verdict on the issue of contributory fault. If a defendant wishes to assert contributory negligence, as with any other affirmative defense, he is required to specifically plead it. (Ill. Rev. Stat. 1987, ch. 110, par. 2—613(d) ("[t]he facts constituting any affirmative defense, such as *** that the negligence of a complaining party contributed in whole or in part to the injury of which he complains, *** must be plainly set forth in the answer or reply").) Failure to plead an affirmative defense results in waiver of that defense, and the jury cannot consider it even if the evidence suggests the possibility of the defense. *Spagat v. Schak* (1985), 130 Ill. App. 3d 130, 134, 473 N.E.2d 988; *Dayan v. McDonald's Corp.* (1984), 125 Ill. App. 3d 972, 466 N.E.2d 958.

In its answer to plaintiff's complaint, City Construction included the following as its affirmative defense:

"Without prejudice to the denials or other statements in the pleadings of this Defendant, and without prejudice to this Defendant's contention that Plaintiffs have the burden of plead-

ing and proving freedom from contributory fault on behalf of the decedent, ALAN R. CARLSON, this Defendant states that in the event that this Defendant's contentions are overruled, then the fault of RICHARD A. HAMPLE was the sole proximate cause of the occurrence outlined in the Plaintiffs' Fourth Amended Complaint in one or more of the following ways: *** "

The pleading then set forth eight subparagraphs detailing the ways in which Hample allegedly caused the decedent's death.

Initially, we note that City Construction's assertion in its affirmative defense that the plaintiff has the burden of pleading and proving decedent's freedom from contributory fault is incorrect. Since the adoption of comparative fault in Illinois in 1981 in *Alvis v. Ribar* (1981), 85 Ill. 2d 1, 421 N.E.2d 886, the plaintiff bears no burden to prove an absence of contributory negligence. (*Casey v. Baseden* (1986), 111 Ill. 2d 341, 344-45, 490 N.E.2d 4; *Johnson v. Colley* (1984), 128 Ill. App. 3d 849, 471 N.E.2d 587, *aff'd in part & rev'd in part* (1986), 111 Ill. 2d 468, 490 N.E.2d 685.) This change has now been incorporated in section 2—613(d) of the Code of Civil Procedure, discussed above.

Beyond this erroneous legal conclusion in its affirmative defense, there were no facts pleaded upon which a conclusion of contributory negligence can be predicated. It is clearly manifest from its face that the only affirmative defense raised by the pleadings was that the conduct of Hample was the sole proximate cause of the decedent's death. Even though it is apparent that defendant drafted the pleadings under an erroneous presumption that plaintiff had the burden to plead freedom from contributory fault, the pleading at issue here nonetheless remains subject to the requirements of section 2—613(d), requirements which it failed to satisfy. It should also be noted that when the motion for a directed verdict was presented and argued below, City Construction still had an opportunity to amend its pleadings, but apparently chose not to do so. As a result, we cannot find error in the trial court's granting of plaintiff's motion.

City Construction argues that it is the plaintiff who has waived any objection to the adequacy of the affirmative defense of contributory negligence by the decedent by failing to move to strike the affirmative defense and by failing to object to the introduction of evidence regarding that negligence. Although it is true that a plaintiff may be held to have waived objection to the sufficiency of a defendant's affirmative defense by not moving to strike the defective pleading, such waiver can occur when the pleadings "substantially but im-

perfectly" plead the defense. (*Champaign National Bank v. Illinois Power Co.* (1984), 125 Ill. App. 3d 424, 465 N.E.2d 1016.) Here there were no allegations of facts whatsoever relating to the decedent's contributory conduct. There was only an assertion of an erroneous legal conclusion as to who bore the burden of proof, but there were no allegations of fact even in conclusory fashion to indicate any negligent conduct by the decedent which may have contributed to his injury.

The next issue raised by City Construction concerns the jury's failure to complete the verdict forms for the counterclaim of City Construction against Cook County and the third-party claim by City Construction against Blizzard. City Construction contends that the court erred in not resubmitting the uncompleted jury verdict forms to the jury, and that as a result a new trial should be granted.

■■■ We need not, however, decide whether error occurred, since both Cook County and Blizzard are no longer parties to this action. Following trial, Cook County settled with the plaintiff, and the court, without objection by any party, ordered that "all actions of all parties, including that of City Construction Company against Defendant County of Cook *** are dismissed with prejudice." City Construction has not appealed from that order. In addition, during oral arguments before this court, we granted City Construction's motion to dismiss this appeal insofar as it relates to Blizzard.

The granting of City Construction's motion to dismiss Blizzard from this appeal also makes it unnecessary to consider City Construction's argument that the trial court erred in finding that Blizzard's settlement with the plaintiff was in good faith and in vacating the judgment against Blizzard.

City Construction's final argument is that the trial court erroneously excluded the pretrial cooperation and indemnification agreement between Blizzard and the plaintiff from introduction into evidence except as an impeachment tool to show bias or prejudice on the part of Blizzard employees. City Construction contends that it was entitled to admit the agreement substantively, particularly since, as a matter of trial strategy, Blizzard's attorney failed to inform those employees of the existence of the agreement, thereby making it impossible to establish a foundation which would permit introduction of the agreement even for impeachment purposes.

■■■ The argument for disclosing such agreements to the jury is that where such an agreement exists, the adversarial relationship of the parties is altered. Parties who initially were at odds become aligned. Without disclosure of the agreement to the jury, they remain unaware of the realignment, and the integrity of the trial is at

risk. The rationale of the rule requiring disclosure of agreements between parties was described in *Lam v. Lynch Machinery Division of Lynch Corp.* (1988), 178 Ill. App. 3d 229, 533 N.E.2d 37. After discussing the cases from which the rule arose, the court stated:

> "In the cases involving such agreements, the courts have ruled that the adversary relationship of the parties must be preserved and one must have an opportunity to show potential bias of a witness. 'Only if these twin concerns do not present themselves as a result of the agreement between plaintiff and defendant will the court be satisfied that the integrity of the judicial process is not jeopardized.' *Schell v. Albrecht* (1978), 65 Ill. App. 3d 989, 993, 383 N.E.2d 15, 18." *Lam*, 178 Ill. App. 3d at 233.

In summary, we find that none of the errors alleged by defendant, either individually or cumulatively, rise to a level of reversible error. (See *Fedt v. Oak Lawn Lodge, Inc.* (1985), 132 Ill. App. 3d 1061, 1072, 478 N.E.2d 459 ("No litigant is assured a perfect trial, but only a fair one").) Accordingly, we affirm the judgment of the circuit court of Cook County and modify the award of damages as set out above.

In a cross-appeal, plaintiff urges this court to grant her costs and attorney fees pursuant to Supreme Court Rule 375 (134 Ill. 2d R. 375), for what she contends is a frivolous appeal filed by City Construction. Rule 375(b) provides, in part, that sanctions, including an order to pay the other party reasonable costs and attorney fees, may be imposed if "it is determined that the appeal itself is frivolous, or that an appeal was not taken in good faith, for an improper purpose, such as to harass or to cause unnecessary delay." (134 Ill. 2d R. 375(b).) "An appeal will be deemed frivolous where it is not reasonably well-grounded in fact and not warranted by existing law as a good-faith argument for the extension, modification, or reversal of existing law." (*Singer v. Brookman* (1991), 217 Ill. App. 3d 870, 880, 578 N.E.2d 1.) The Committee Comments to this rule explain that a determination of whether an appeal is frivolous will be determined by "an objective standard of conduct, *viz.*, an appeal will be found to be frivolous if a reasonable prudent attorney would not in good faith have brought such an appeal, or the appeal conduct will be found to be improper if a reasonable prudent attorney would not have engaged in such conduct." 134 Ill. 2d R. 375(b), Committee Comments, at 330. See also *State Farm Fire & Casualty Co. v. Miller Electric Co.* (1992), 231 Ill. App. 3d 355, 596

N.E.2d 169; *Dreisilker Electric Motors, Inc. v. Rainbow Electric Co.* (1990), 203 Ill. App. 3d 304, 562 N.E.2d 970; *Kennedy v. Miller* (1990), 197 Ill. App. 3d 785, 555 N.E.2d 105.

Even though some of the issues raised on appeal were more obviously sustainable than others, we disagree that this appeal as a whole was frivolous. This conclusion is further evidenced by our determination that defendant is entitled to a remittitur on the damages awarded to the decedent's estate. As a result, we deny plaintiff's request for sanctions.

Affirmed as modified.

McNULTY, P.J., and MURRAY, J., concur.